Mr. Justice CAMPBELL
dissenting.
■I dissent from that part of the opinion of this court which allows to the libellants a decree against the libellee for the amount of his contributory share in the account of average.
The libel is for the non-delivery of cargo according to the conditions of a bill of lading. The exemption claimed in the answer is, that the failure was occasioned by a peril of the seas, which made a jettison of the goods necessary; and this issue was tried, in the District and Circuit Courts.
The objection raised here is, that the exemption is not complete, unless the contributory share of the libellee, to be ascertained, in the first place, by the-adjustment of an average account, is also admitted and tendered.
In Bird v. Astcott, (Bulst., 280,) which was an action on the case against a carrier, for the non-delivéry of goods lost by a jettison, Coke, Lord Ch. J., cited a case which had been decided, and said, in respect to it, “We all did resolve, that this being the act of God, this sudden storm, which occasioned the throwing over of the goods, and which could not be avoided; and for this reason the plaintiff recovered nothing.” (Mouse’s case, 12 Co., 63.)
I have not been able to find a precedent, either in the United States or Great Britain, where a contributory share, in the nature of average, has been recovered, in a contentious litigation, in an action on a bill of lading for the non-delivery of cargo.
But the books of precedents show that average contributions *175 are recoyered in actions, either, of special or general assumpsit, the form of the action depending on the fact of the adjustment of the account. (2 Chitt. Plead., 50, 152, 161; Saund. Plead. and Ev., 278.)
“I entertain a decided opinion,” said Chancellor, then Ch. J. Kent, “that the established principles of pleading, which • compose what is called its science, are rational, concise, luminous, and ought, consequently,-'to he very carefully touched by the hand of innovation.” (1 Joh., 471, Bayard v. Malcolm.) Arid the advantage of an orderly, not- to say scientific system of administration, is as apparent in the courts* of admiralty, and the mischiefs of "uncertainty or inexactness are as positive there, as in any other tribunals. Such seems to have been the opinion of Justice Story i (The Boston, 1 Sum., 328.) This difference iri opinion with the court'would riot' have been the Sround of a public dissent on my part, if I had not deemed the ecree .erroneous, and if I did not believe-that the parent error is to be found in this departure from accurate pleading. The decree treats the liability of the master or owner for an average contribution as an integral part of their special written contract of affreightment; ■and their failure to pay their share of average is disposed of as a breach of the express obligation. •My opinion is, that the obligations are distinct, though intimately associated, and are referable to different principles of law; and in the judicial administration of the United States may be subject to distinct-jurisdictions.
The principle of the rule of general contribution, as applied to the case of a jettison, exists in all commercial Rations.; and the rule itself became a part of the statute law of England, in the reign of the Conqueror,, and that of his youngest son. In a later period, the samé principle was applied to a.great number of analogous cases.
The inquiry is, upon what courts was the duty devolved of enforcing and administering this principle of general jurisprudence, and particularly in the cases of average ? In Berkley v. Peregrave, (1 East., 220,) which was a- special action of assump-sit for average on an unadjusted average account, Lord Kenyon says: “This action,.the grounds and nature of which are fully set out in. the special count, is founded in the common principles of justice.. A loss is incurred, which the law directs shall beborne by cei’tain persons in their several proportions. When a loss is tó be repaired in damages, where else can they “be recovered but jn the courts of common law? And wherever the law gives a right, generally, to demand payriaent of another, it raises an implied' promise in thrit person.to pay.” In Dobson v. Wilson, (3 Camp., 480,) Lord Ellenborough said: “A *176 court of ¿equity may perhaps be a more convenient forum for .adjusting the-claims of the different parties concerned; but if a shipper of goods,' which are sacrificed for the salvation of the rest of the cargo, is entitled to receive á contribution from another shipper whose goods are saved, I know not how I can say this may not be recovered by an action at law. ' This is a l’egal right, and must be accompanied with a legal remedy. The difficulty, of showing, by strict evidence, the exact amount of the contribution, is great; htit, as there are data upon which it may he calculated with great "certainty; I think, is no objection to the action.” (Price v. Noble, 4 Taun., 123.)
Holroyd,in the argument of the case in East.,'said: .“At the common law, where a contribution was required, a writ of ' contribution issued, precedents of which are.to be found. (Fitz. Nat. Brev.) This has fallen into disuse; because, in most instances,. as'many persons were concerned, a .more easy remedy was administered in equity.”
' .And so, from the earliest of the chancery reports, we, learn' that chancery Will ehforce an average or contribution to be made, when .neéessary, -and that it will enforce an agreement among' merchants to pay average. (Comyns’s Dig., Chan. 2 J., 2 S.; Hick v. Pallington, Moor., 442; Ca. Parl., 19.) Spence, in his history of equitable jurisdiction, says,- “ That the court of chancery, from a périod which cannot be traced, but which, -.as it was also apparently adopted from the Roman.law, was. .probably coeval With thé establishment of the court, exercised jurisdiction to compel contribution amongst general shippers ■of goods, when those belonging to One were thrown overboard for the .safety of the ship,'or in casps, as they are technically called, of general average.” (1 Spenc. Eq. Ju., 663.) The popular, treatises on- the chancery system show that the title “Contribution” is one of great reaen,-comprehending.a variety of cases which rest upon a-familiar maxim of equity, and that average is only an instance .of its 'application. How stands. the historical evidence in regard to the jurisdiction of the admiralty courts,-with reference to.this subject? "What'say the “Black Book” and “G-odólphin,” or the controversionalists, Prynne, or Jenkins, in support of the ancienp claims of‘these tribunals? "What"is.to be found in the'.treaty of limits be-, tween the-courts of common law and admiralty?. -.In the case. ' of thé Constancia, (2 W. Rob., 488,) a .question arose upon the distribution.of the proceeds of a ship and cargo which-were; on deposit in the registry of the court, in- a cause in which its jurisdiction.was'indisputable.
The claimant asserted a -preference in. the- distribution, be-, cause a. portion' Of the cargo belonging to .him had been sold *177 for the repairs of the ship. The learned judge of that court said: “As far as my owp experience extends, no claim of a similar description is to be found in the annals of the court; a circumstance which naturally induces me to consider with some carefulness whether the noyelty of the claim be specious or real. In other words, whether, novel in appearance, it does not rest upon some recognised principles by which other claims have been decided. "What, then, is the true character of the claim in question? It is-a claim on behalf of the owners of' certain property shipped on board of the vessel, and applied to relieve the ship’s necessities, and to enable her to complete her voyage.
“In the case of the G-ratitudinine, Lord Stowell has held that property so sacrificed is to be considered as the proper subject' of general average; and Lold Tenterden, in his book on shipping, lays down the samé doctrine. If this be so, and if, upon the authority of my Lord Stowell, thus confirmed by my Lord Tenterden, I am to consider this claim as a subject,of general average, two considerations immediately suggest themselves. First, whether I have any jurisdiction at all over questions of general average; and,'secondly, whether I could satisfactorily,, exercise such a jurisdictioh under the circumstances of this case? The absence of ahy precedent, where the court has ex* ercised the jurisdiction, is of itself a stron g prima fade proof that I have no authority to entertain the question at all; and I am the more strongly inclined to this opinion* hy the further consideration- that, in all cases of average, it is essential that the tribunal which is to adjust it should have the power to compel all parties interested to come in, and to pay their quotav I possess no such powers and if I could not- bring all parties interested before the court, I could not adj ust a general average,' which is a proportionate contribution by all:” . These citations-from the opinions of the various tribunals which administer different departments of the judicial power of Great Britain,, show that the doctrine upon which average contributions is made is not peculiar to the maritime códe; and, also, that the' maritime courts of the first commercial power that has existed have never administered it, and their judges suppose their modes of proceeding unsuitable to it. In the case of the Con-stancia, the m was in the custody of the court of admiralty, yet that court denied the existence of a maritime lien, or that any liability of the freighters against the ship could be enforced there. And this, is equally apparent from the doctrines of the courts of chaneeiy and law. In Hallett v. Bonsfield, (18 Vesey, jr., 187,) which was the case of a shipper whose property had been overthrown to. lighten a ship in a storm» and who moved *178 to restrain, the master and ship-owner from delivering any part of the cargo and receiving the freight, or parting with any share of the ship, Lord Eldon said, “ that in such a case there is a lien upon the goods of each freighter, for contribution and average, in some sense; that is, the master is not bound to part with any part of the cargo until he has security from each person for his proportion of the loss; but there is no authority, that on the ground, that he has a lien to the extent of entitling him tó call on every person to give security for tbé amount of their average when it shall be adjusted, every owner' of a part of the cargo can compel the captain to do so; and it strikes ine, upon the. short time I have had to consider it, that is a length the plaintiff cannot reach. The defendant it is true is a trustee for others, but the nature of the trust is regulated by the practice; and there is no instance of an action, or a suit in equity, to effectuate the lien, otherwise than through the-right ‘ of the master to take security; that practice ascertaining the true nature añd extent of the trust.” .This lucid statement of the English law explains the meaning of the older class of writers on commercial law, when they speak of the master’s lien, and his duty to settle an average account.
Yalin observes, that the article of the ordinance of 1681, which confers a right of detention upon the master, does not impose an imperative obligation upon him,^ and that he may ■deliver to each freighter hiS" goods, without fear of consequences, unless specially required to withhold them.’ And other writers'concur in the opinion, that the freighters, under that ordinance, had no action against one another. (Boucher Droit Mar., 450, 451.)
Lord Tenterden citep this case from Vesey, jr., without dissent, in his work on shipping, (Abb. on Ship., 508;) and in Simonds v. White, (2 B. and C., 805,) he describes the powér of the master over the goods “ as a power of detention,” given in order that the expense, inconvenience, and delay of actions and suits, may be avoided. This court, in Cutler v. Rae, (7 Howard, 729,) declared that the party entitled to contribution “has no absolute and unconditional lien upon the goods liable to contribute. The captain has a right to retain them until the general average with which they are charged has been paid or secured; and, that this right of retainer is a “qualified lien,” ■ “ dependent on the possession of the goods by the master or ship-owners,” and “ ceases when they are delivered to.the owner.; . or consignee; ” “ and does not follow them into their hands, nor adhere to the proceeds; ” and a corresponding opinion of Lord . Tenterden is to be found in Scaife v. Tobin, (3 Barn. and Ad., 523,) in which he says, “a consignee who is the absolute own *179 er of the goods is liable to pay general average, because the law throws upon him that liability; but a mere consignee, who is not the owner, is not liable.” And this demonstrates that the lien for average is not a maritime lien. A maritime lien does not include or require possession. The claim or privilege travels with the thing, into whosesoever possession it may come. It is inchoate from the moment the claim or privilege attaches, and when carried into effect by .legal process, by a proceeding in rem, relates back to the period when it first attached. (Harmer v. Bell, 2 L. and Eq., 63.) These cases show, that neither in the adjudications of the courts of Great Britain or the United States, nor in the usages of their merchants, is there any sanction for the doctrines of this decree. hTo adjudication during sixty years of our history is to be found, where the power to adjust of to collect an average account is affirmed, or has beén exerted by the district courts sitting' in admiralty, upon direct application to them for the purpose.
The importance of the subject will justify me in an examination of the continental authorities, which are supposed to . establish the existence of a maritime lien for contribution. • The ancient codes do nothing more than recognise the existence of a rule of contribution in regard to losse’s arising from a jettison, or cases of a similar, character, and the master’s . power of detention of the cargo saved, for the security or payment of the contributory shares, but they do not ascribe any greater operation to the rule, either in affecting property or in esignating the jurisdictions to which the enforcément of the rule should be committed.
The leading authority cited for . the doctrine, that average affords a maritime lien on. the properly saved, is found in a line of Emerigon, who says, “the action in contribution is real in its nature.” :
But that author discriminates the feature in a real action to which the action in contribution has any resemblance. The feature is, “ that the action vanishes if the effects saved by means of the jettison perish before arriving at their destina-tion.”.
The real action is for a thing, or to assórt some right in it, and is terminated by its surrender, or destruction without the fruit of the possessor. éiSo long as the ship and. cargo are exposed to peril in the same voyage in which the jettison is made, the action in contribution is inchoate, and dependent on the ultimate safety of the thing; and thus far it resembles a real action. But when the safety of the ship and cargó is confirmed, the liability of the contributories becomes personal, and the sums due axe recoverable without further reference to *180 them; iu France, by action in contribution; and in England, by a bill in equity for contribution, or action of assumpsit. It is a great mistake to suppose that the action in contribution was a hypothecary action, as I shall hereafter show.
In the time of Emerigon it was thrown upon the master, as the legal attorney of all persons interested in the ship and cargo. It was his duty to collect the contributory, shares, and to pay them among' the parties concerned; but he was not liable for the shares of insolvents, nor obliged, to detain the goods, and that was an unusual, if not an unprecedented remedy.
The ordinance of 1681 simply permitted this remedy to be used. This ordinance was defective,, in not defining the rights óf the master in the goods liable to contribution. The ordinance. id not take the precaution to establish the existence and legitimacy of privileged claims, is the testimony of those ' who framed the Code of Commerce of Napoleon. (3 Locré Com., 22.) . The Code of Commerce was framed to repair . what was considered a defect. In reference to average, it provides, “that in all the cases before mentioned, the master and mariners have a privilege on the goods of their proceeds for the amount of the contribution.” This clause Was not in the “projét” of the commission,•> nor in their revision; but after successive changes, the article appears in this form for the first time in the final draught of the code. The jus in re is conferred by this clause on the master, and he may proceed to enforce his rights by judicial seizure and sale, or-opposition, or he may sue each contributory for his share in contribution, and is responsible in an action to each of them. ' But the eyils of dormant liens are removed by limitations upon the extent and duration of the claim. The code bars actions against the freighter who- receives his goods and pays his freight without a legal notice of the claim for average; and each claim must be notified in twénty-foür hours to the opposite party, and be pursued by judicial demand in one month. (Thier Droit Con., 41, 124, 277; 4 Locré Com.; 3 Pard. Droit Com., sec. 750; 18 Dall., 544.)
. Other articles define the liability of the owner, and the contributory share of the ship and cargo, the responsibility of the master, and create a privilege upon the ship and freight to answer the agreements of the charter-party, and whatever defaults of the master and- mariners. (Thiernt Con. Droit, 28, sec. 2; 29, sec. 11; Code de Com., 190, secs. 11, 216, 222, 280.)
The commentaries of Pardessus, Locré, Boulay, Paty,. and other authors, are made upon these enactments of French statute law. They affirm that these articles establish, as the *181 law of France, that the frieghter of a ship is obliged, by a contract1 or quasi contract to the master, to contribute Eis share of an average contribution; and that the master engages to indemnify the freighter whose properly has suffered or been sacrificed for the common benefit; añd that reciprocal fights of action are given to either party. J have no occasion to question the accuracy of their conclusions,, nor to deny that the code itself embodies the-usages, experience, and regulations, of the French nation in the management of their commerce, and is adapted- to the wants and habits • of their merchants. And no one can doubt that the authority of Louis XTV and ÍTapoleon fras adequate to the introduction of the ordinance and the code. But the question arises here — and it is ,one of grave import to those who desire to preserve the Constitution of the Union inviolate, and the limits it prescribes to the judicial power of the Federal Government, and the lines of division among the Federal courts undisturbed — the question arises, by what authority is it that the commercial system of France, the product of the legislative authority of her. monarchs, has become the basis for judicial decision in the courts of the United Statés, and her legal administration of purely municipal regulations is taken as a guide to ^determine the jurisdictional limits of those courts of justice ? That Congress may prescribe rules in reference to the settlement of average contributions, arising in the foreign or federal commerce of the country, may be -admitted, and also may assimilate-the American and French systems of commercial regulation. But I am not prepared to admit that this can be done by judicial authority.
The commercial systems of Great Britain and the United States recognise no such contract .between the masters and freighters as the French code establishes; they invest the master with no such privilege upon the property of the shippers; they confer no such powers to maintain suits, and. subject him to no such liabilities. The policy and spirit of the British and American commercial systems tend to restrain the agency and control of subordinates to precise limits in settlements or contests with respect to property and obligations; wherever it can be doñe, they bring the owners of the property, and the principals in the obligations, to .confront one 'another.' In my opinion, this decree introduces a new principle into the American commercial system, and that tins interpolation adds to the jurisdiction pf the judiciary department of thte Government. This is done.by judicial authority.' In my opiniofi; the Constitution does not give such á power to this court, I therefore dissent from thé decree.
*182 Having carefully examined the foregoing - opinion of Mr. Justice CAMPBELL, after it was in print, I am satisfied with its . correctness, and concur therein. . J. CATRON.

Order.

This cause came on to he heard on the transcript of the record from the Circuit "Court of the United States for the eastern district of Louisiana, and was argued' by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed, by this court, that the decree of the said Circuit Court in this cause be and the same is hereby reversed, without costs, and that this cause be and the same is hereby remanded to the said Circuit Court, with directions to ascertain the amount of the lien of the libellants on the Ann Elizabeth, for the share to be contributed by the vessel towards the loss sustained by the libellants, and to enter a decree accordingly.